IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

WERTMAN V. BOLLINGER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

BRIANNE WERTMAN, NOW KNOWN AS BRIANNE LUKASSEN, APPELLEE,
V.
ANDREW K. BOLLINGER, APPELLANT, AND STATE OF NEBRASKA, INTERVENOR-APPELLEE.

Filed November 25, 2014.    No. A-13-364.

Appeal from the District Court for Sarpy County: DAVID K. ARTERBURN, Judge. Affirmed.

Michael L. Munch for appellant.

William P. McKenzie, Deputy Sarpy County Attorney, for intervenor-appellee.

IRWIN, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

Andrew K. Bollinger appeals from the decision of the district court for Sarpy County that found him in contempt of court for failure to pay child support. We affirm.

BACKGROUND

Bollinger and Brianne Wertman had a relationship that resulted in the birth of a child, Daniel Bollinger, in 1999. Bollinger was found to be Daniel's father by a decree of paternity entered in Sarpy County on January 28, 2001 or 2002 (both years are mentioned via testimony, exhibits, or in the transcript, but the actual decree does not appear in the record before us). Bollinger was ordered to pay child support at a rate of $420 per month. However, pursuant to a March 2008 modification order, Bollinger's child support was reduced to $150 per month, retroactive to May 1, 2007 (the modification order does not appear in the record before us).

On April 11, 2012, the State, through a deputy Sarpy County Attorney, filed an "Application for Order to Show Cause" (Application) against Bollinger. In its Application, the State "advise[d] the court" that Bollinger was previously ordered to pay $150 per month in ongoing child support and was also ordered to provide dependent health and medical insurance

- 1 -

coverage for Daniel, but that Bollinger had failed to comply with the terms of the court's prior order. The State attached a copy of Bollinger's child support payment history from January 1, 2010, through April 10, 2012, to its Application and incorporated the payment history by reference into the Application. The State specifically called attention to the period of time beginning on January 1, 2010, through the date of the filing of the Application, wherein Bollinger was ordered to pay $150 per month in child support, for a total of $4,200, but had paid only $369.98. The State advised that Bollinger's total child support arrearage was $41,636.11 and that Bollinger had provided no explanation or good cause for his failure to pay support as ordered. The State further advised that Bollinger had not contacted Sarpy County Child Support Services or the Nebraska Child Support Call Center in the past 90 days about his failure to comply with the order, nor had Bollinger provided a credible explanation to the State for his failure to comply with the court order. The State asked the court to issue an order directing Bollinger to appear before the district court's child support referee to show cause why he should not be found in contempt of court and sanctioned accordingly.

On April 12, 2012, the district court issued an "Order to Show Cause Appointment of Attorney and Order to Produce." The district court stated that pursuant to the provisions of Neb. Rev. Stat. § 42-358 (Reissue 2008), the Nebraska Department of Health and Human Services office and/or the clerk of the district court for Sarpy County certified this case as one in which there were delinquencies in the payment of the court-ordered child support in an amount equal to such support due and payable for a 1-month period of time, or as otherwise provided by order, and/or one or more parties had failed to provide dependent medical support and/or pay court costs and related fees, as ordered. The court stated that "[t]hese delinquencies and/or deficiencies are set forth in detail in the Application for Order to Show Cause filed by the State of Nebraska contemporaneous to the date of this Order." The court ordered the State to intervene through the deputy Sarpy County Attorney for child support enforcement and appointed him to commence civil contempt, income withholding, and/or any other necessary lawful proceeding. The court ordered Bollinger to appear before the district court and/or its child support referee (referee) and show cause as to why he should not be found to have willfully and contumaciously violated the order for support by failing to pay child support and provide dependent health and medical support in amounts as previously ordered.

Bollinger appeared pro se before the referee on October 23, 2012. Prior to that hearing date, Bollinger apparently made an oral motion to dismiss the action. At the October 23 hearing, the referee addressed Bollinger's motion to dismiss after receiving the briefs filed by Bollinger and the State. The referee overruled Bollinger's motion to dismiss, which was based on jurisdiction. Bollinger then requested court-appointed counsel, his request was granted, and the hearing was continued to January 23, 2013.

On January 23, 2013, Bollinger appeared at the show cause hearing with counsel. Counsel asked the referee to reconsider Bollinger's motion to dismiss. Counsel argued that the application did not allege that there was a willful or contumacious failure of Bollinger to pay the child support, nor did it allege that Bollinger had the ability to pay the support as ordered. Additionally, counsel argued that the application was merely signed by counsel for the State and that there was no sworn affidavit accompanying the pleading that would bring the matter before the court. Citing to *Wright v. Wright*, 132 Neb. 619, 272 N.W.2d 568 (1937), counsel renewed

Bollinger's motion that the matter be dismissed for lack of subject matter jurisdiction. The referee again overruled Bollinger's motion to dismiss and proceeded on the contempt action.

At the contempt hearing, a certified copy of Bollinger's child support payment history report was received into evidence without objection. The payment history reflected events from June 1, 2001, through January 11, 2013, and showed that Bollinger had a total arrearage of $43,892.21.

Bollinger testified that he was 36 years old. When Bollinger was originally adjudged to be Daniel's father and ordered to pay child support in January 2001 or 2002, he worked at a restaurant and earned approximately $15,000 per year. Bollinger and his wife started their own courier business in 2005. He worked an average of 40 hours per week for the business. However, there was no testimony or other evidence of Bollinger's income from the courier business from 2005 until 2011. Bollinger testified that he and his wife reported a loss on their 2011 taxes and that he thought the business earned $21,000 before expenses in 2012 (although they had not yet completed their 2012 tax return). Bollinger has also worked part time at Auto Zone since September 2012. He worked an average of 20 hours per week at Auto Zone, earning $8 per hour. Bollinger testified that he was also trying to finish school at a university, but he did not elaborate any further.

When asked if there was a reason that he had fallen $43,000 behind in child support, Bollinger responded, "[T]here's always been an underlying issue that I've had Daniel the majority of the time. For a number of years, I also had his brother as well in my care that was biologically not mine." Bollinger testified that "if we're going all the way back to 2001, basically, I pretty much ended up having to give up work, aside from a part-time basis, which only paid sporadically, because I had to care for these children. I ended up becoming a stay-at-home father to them." (However, at a July 2004 hearing on Bollinger's complaint to modify, Wertman testified that when she had Daniel in daycare in the past, Bollinger did not pay his share of the daycare costs, resulting in Daniel's being kicked out of two different daycares. She started leaving Daniel and his brother with Bollinger, who did not work during the day, because she had to work a lot of hours to support herself and her children and she received no financial help from Bollinger, except for reducing her childcare costs by having him provide childcare.) Bollinger testified that he had tried 15 times to modify the support order, but had not been successful.

Bollinger testified that his parenting time had recently been closer to "50/50" and that he had Daniel Tuesdays and Thursdays overnight and every other weekend. Bollinger also had Daniel before school on Monday, Tuesday, and Thursday mornings (in addition to the Wednesday and Friday mornings Daniel was already at Bollinger's home because of the overnight parenting time).

Bollinger testified that in addition to feeding Daniel meals, he paid for Daniel's clothes, lunches, and sports activities. Bollinger testified that he understood that paying for clothes, lunches, and activities would not give him a credit on his child support obligation.

Bollinger testified that he got a job at Auto Zone in order to make his child support payments. He testified that when he started working at Auto Zone, he set up voluntary income withholding to cover his $150 monthly child support obligation, plus an additional $25 per month to go toward his arrearage. He said he cannot afford to pay more than $25 per month

toward the arrearage until he can get more hours because that "pretty much takes my whole check."

When asked if he had applied for full-time work in the past 90 days, Bollinger responded, "Oh, no, because I already have a job." When asked if he was looking to replace his part-time Auto Zone job with a full-time job, Bollinger responded, "No, I wouldn't quit that job," because he can get "all kinds of ASC certifications paid for by them" and "the potential benefits for the training and all that, that are free, are not worth the risk of trying to go somewhere else." However, at the time of the contempt hearing, Bollinger was not enrolled in any of the training/certification classes because they were not available to him until he had been employed for 6 months, and he had only been employed at Auto Zone for 4 months.

At the conclusion of the evidence, and in her report, the referee found that as of January 11, 2013, Bollinger was $43,892.21 in arrears in his child support obligation. The referee found Bollinger in willful and contumacious civil contempt for failure to pay child support. Bollinger was sentenced to 180 days in jail beginning February 1, 2013, but was informed that he would not go to jail if he paid $50 per month toward his arrears in addition to keeping current on his $150 monthly child support payment. The referee's report also stated that child support payments made pursuant to this purge order "must be in sufficient amounts to continuously reduce the amount of principal court ordered child . . . support arrears owed by [Bollinger] over the course of this purge order." The referee specifically found that Bollinger had the ability to pay his current child support obligation and make payments toward his arrearage. The district court approved and adopted the referee's report on January 29, 2013.

Bollinger filed his "Notice of Exceptions and Request for Review" regarding the referee's report. Trial on the exception was heard by the district court on March 25, 2013. The bill of exceptions from the proceedings held before the child support referee was received into evidence. The matter was argued and taken under advisement. In its order filed on April 18, the district court overruled the exception and affirmed the child support referee's determination that Bollinger was in willful and contumacious civil contempt of the court's child support order. Bollinger appeals.

ASSIGNMENTS OF ERROR

Bollinger assigns that the district court erred in (1) denying his motion to dismiss the State's application for lack of jurisdiction and (2) finding that the State presented sufficient evidence to establish that he was in willful and contumacious contempt of a court order for child support.

STANDARD OF REVIEW

In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which (1) the trial court's resolution of issues of law is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error, and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed is reviewed for abuse of discretion. *Hossaini v. Vaelizadeh*, 283 Neb. 369, 808 N.W.2d 867 (2012).

ANALYSIS

*Jurisdiction.*

Bollinger argues that the district court erred by not granting his motion to dismiss the State's application for an order to show cause on the basis that the court lacked "jurisdiction." We note that no written motion to dismiss is in our record; however, the record suggests that an oral motion had been made by Bollinger to the referee. At a hearing on October 23, 2012, the referee referenced Bollinger's oral motion and received into evidence the briefs of the parties which contain their arguments on the matter of "jurisdiction."

In Bollinger's initial brief to the referee, he stated that the contempt proceeding should be dismissed "based upon a lack of jurisdiction," due to the fact that the county attorney did not submit a sworn affidavit with its application for order to show cause and because there was no allegation that Bollinger had the ability to pay the court-ordered child support or that his failure to pay was willful and contumacious. In his argument to the court below, and to this court on appeal, Bollinger relies on *Wright v. Wright*, 132 Neb. 619, 272 N.W. 568 (1937), to support his argument. In *Wright*, a woman brought a contempt action against her ex-husband for failure to pay child support. The woman instituted the action by filing a motion and affidavit alleging that a support order existed and no payment had been made. The trial court found the ex-husband in contempt of court and ordered him to be confined in jail. On appeal, the Nebraska Supreme Court reversed and dismissed the trial court's ruling. The court said:

> "In a proceeding to punish for an alleged contempt, not committed in the presence of the court, the affidavit upon which the proceeding is based is jurisdictional, and it must affirmatively disclose sufficient facts to show that the case is one over which the court has jurisdiction. . . ."

*Wright*, 132 Neb. at 623, 272 N.W. at 570, quoting *Hawthorne v. State*, 45 Neb. 871, 874, 64 N.W. 359, 360 (1895). The court in *Wright* found the affidavit submitted to the trial court fatally defective because it did not allege that the ex-husband had the ability to pay or that his failure to pay was willful. Based on this holding in *Wright*, Bollinger stated in his reply brief to the referee, "No affidavit; no jurisdiction."

The State's argument to the referee was that the *Wright* case "predates by many years no fewer than seventeen (17) revisions to Nebraska law relating to the process of obtaining a determination of civil contempt for nonpayment of child or spousal support." The State further argued to the referee that *Wright* involved "a private action initiated by a custodial parent" and that "in contrast to the facts in *Wright*," the State (in the instant case) filed an application for order to show cause in response to a request from the court.

During a hearing before the referee on January 23, 2013, newly appointed counsel for Bollinger argued that prior to his appointment, the court had overruled Bollinger's pro se motion to dismiss. The appointed attorney asked the referee to reconsider the motion to dismiss, again arguing the State's failure to attach a sworn affidavit and failure to allege a willful or contumacious failure by Bollinger to pay child support. Counsel referenced *Wright, supra*, and stated that in the absence of an affidavit, "the Court does not have jurisdiction to hear the case," and he renewed "the motion that this matter be dismissed for lack of subject matter jurisdiction." In the "Referee Report and Order From Show Cause Hearing," entered January 29, the referee

stated that the court had jurisdiction of the parties and subject matter of the action. In an order entered April 13, the district court found that "the referee was correct first in denying [Bollinger's] motion to dismiss the show cause."

We now consider whether the district court had subject matter jurisdiction to take up the contempt matter due to the State's not attaching a sworn affidavit to its application for an order to show cause and due to the State's not alleging Bollinger's ability to pay or that Bollinger's failure to pay child support was willful or contumacious. In essence, Bollinger is arguing that these pleading deficiencies result in the trial court's lacking subject matter jurisdiction. Subject matter jurisdiction deals with a court's ability to hear a case; it is the power of a tribunal to hear and determine a case of the general class or category to which the proceedings in question belong and to deal with the general subject matter involved. *Anderson v. Wells Fargo Fin. Accept.*, 269 Neb. 595, 694 N.W.2d 625 (2005). The Nebraska Supreme Court reviewed a district court's dismissal of an action for lack of subject matter jurisdiction and provided a helpful distinction between the two ways a party may challenge a court's subject matter jurisdiction. The court stated:

> Because Nebraska's notice pleading rules are modeled after the Federal Rules of Civil procedure, we look to the federal decisions for guidance.
>
> It is well established in federal courts that there are two ways a party may challenge the court's subject matter jurisdiction under Rule 12(b)(1). The first way is a facial attack which challenges the allegations raised in the complaint as being insufficient to establish that the court has jurisdiction over the subject matter of the case. In a facial attack, a court will look only to the complaint in order to determine whether the plaintiff has sufficiently alleged a basis of subject matter jurisdiction. The second type of challenge is a factual challenge where the moving party alleges that there is in fact no subject matter jurisdiction, notwithstanding the allegations presented in the complaint. In a factual challenge, the court may consider and weigh evidence outside the pleadings to answer the jurisdictional question.
>
> A motion to dismiss becomes a factual challenge to the court's subject matter jurisdiction when the moving party supports its motion by presenting affidavits or other evidence properly brought before the court. The party opposing the motion must then offer affidavits or other relevant evidence to support its burden of establishing subject matter jurisdiction.
>
> In this case, the defendants filed a motion to dismiss but did not offer any evidence in support of their motion. Accordingly, we consider the defendant's motion to be a facial challenge to the district court's jurisdiction, as opposed to a factual one. Because it is a facial challenge, we must accept all of the allegations made in [the plaintiff's] complaint as true and draw all reasonable inferences in favor of [the plaintiff].

*Washington v. Conley*, 273 Neb. 908, 912-13, 734 N.W.2d 306, 311 (2007).

The Supreme Court concluded in *Washington* that the district court erred in dismissing for lack of subject matter jurisdiction, because the allegations presented in the complaint were sufficient to vest jurisdiction in the district court. As occurred in *Washington*, Bollinger did not offer any evidence to support his motion to dismiss; rather, he asserts only pleading deficiencies.

We therefore review his motion to dismiss as one based on a facial attack of the application for order to show cause.

Review of a motion to dismiss "for lack of subject matter jurisdiction under rule 12(b)(1) which is limited to a facial attack on the pleadings is subject to [a] de novo standard of review." *Anderson*, 269 Neb. at 599, 694 N.W.2d at 629.

In a facial attack, a court will look only to the complaint in order to determine whether the plaintiff has sufficiently alleged a basis of subject matter jurisdiction. *Washington, supra*. In its application for order to show cause, the State brought the action pursuant to § 42-358, which provides for the appointment of an attorney by the court to initiate contempt proceedings for the collection of delinquent child support payments. Section 42-358 states in relevant part:

> (2) Following entry of any decree, the court having jurisdiction over the minor children of the parties may at any time appoint an attorney, as friend of the court, to initiate contempt proceedings for failure of any party to comply with an order of the court directing such party to pay temporary or permanent child support. The county attorney or authorized attorney may be appointed by the court for the purposes provided in this section, in which case the county attorney or authorized attorney shall represent the state.

> (3) The clerk of each district court shall maintain records of support orders. The Title IV-D Division of the Department of Health and Human Services shall maintain support order payment records pursuant to section 43-3342.01 and the clerk of each district court shall maintain records of payments received pursuant to sections 42-369 and 43-3342.01. For support orders in all cases issued before September 6, 1991, and for support orders issued or modified on or after September 6, 1991, in cases in which no party has applied for services under Title IV-D of the federal Social Security Act, as amended, each month the Title IV-D Division shall certify all cases in which the support order payment is delinquent in an amount equal to the support due and payable for a one-month period of time. The Title IV-D Division shall provide the case information in electronic format, and upon request in print format, to the judge presiding over domestic relations cases and to the county attorney or authorized attorney. *A rebuttable presumption of contempt shall be established if a prima facie showing is made that the court-ordered child or spousal support is delinquent.* In cases in which one of the parties receives services under Title IV-D of the federal Social Security Act, as amended, the Title IV-D Division shall certify all such delinquent support order payments to the county attorney or the authorized attorney.

> In each case certified, if income withholding has not been implemented it shall be implemented pursuant to the Income Withholding for Child Support Act. If income withholding is not feasible and no other action is pending for the collection of support payments, the court shall appoint an attorney to commence contempt of court proceedings. If the county attorney or authorized attorney consents, he or she may be appointed for such purpose. The contempt proceeding shall be instituted within ten days following appointment, and the case shall be diligently prosecuted to completion.

(Emphasis supplied.)

Section 42-358 is applicable in cases arising under the paternity statutes. See, generally, *Mitchell v. French*, 267 Neb. 656, 676 N.W.2d 361 (2004). Bollinger was found to be Daniel's father by a decree of paternity entered in 2001 or 2002, and he was ordered to pay child support. Child support was later modified in 2008. Neb. Rev. Stat. § 43-1412(3) (Reissue 2008) provides that if a judgment is entered in a paternity action declaring the alleged father to be the father of the child, the court shall retain jurisdiction of the cause and enter such order for support. And Neb. Rev. Stat. § 43-512.04 (Reissue 2008) provides that an action for child support may be brought separate and apart from any action for dissolution of marriage; failure on the part of the defendant to perform the terms of the child support decree shall constitute contempt of court and may be dealt with in the same manner as other contempts. In *Smeal Fire Apparatus Co. v. Kreikemeier*, 279 Neb. 661, 675, 782 N.W.2d 848, 862 (2010), *disapproved on other grounds, Hossaini v. Vaelizadeh*, 283 Neb. 369, 808 N.W.2d 867 (2012), the Nebraska Supreme Court said:

> We have stated that a court that has jurisdiction to issue an order also has the power to enforce it. A court can issue orders that are necessary to carry its judgment or decree into effect. Nebraska courts, through their inherent judicial power, have the authority to do all things reasonably necessary for the proper administration of justice. And this authority exists apart from any statutory grant of authority. We have recently explained that the power to punish for contempt is incident to every judicial tribune. It is derived from a court's constitutional power, without any expressed statutory aid, and is inherent in all courts of record.

In the instant case, in a proper exercise of its judicial authority as set forth above, the trial court appointed an attorney to initiate a contempt proceeding pursuant to the specific provisions of § 42-358. Nothing in § 42-358, or in case law since its enactment, requires an affidavit to be filed when contempt proceedings are initiated through a county attorney under this statute. It does not require that allegations must be made regarding ability to pay or willful and contumacious failure to pay. To the extent that *Wright v. Wright*, 132 Neb. 619, 272 N.W. 568 (1937), refers to an affidavit as jurisdictional in a contempt action brought by a private party, we find that holding is not controlling in this case where the action was brought specifically by a subsequently enacted statute that gives courts and county attorneys the ability to enforce child support orders through contempt proceedings under a statutorily created rebuttable presumption of contempt when a prima facie showing is made that the court-ordered child support is delinquent. In the instant case, the State's pleading set forth the order in effect pertaining to Bollinger's obligation to pay child support, alleged that Bollinger had failed to comply with the terms of that order, attached and incorporated Bollinger's child support payment history reflecting total child support arrears of $41,636.11, and further alleged that Bollinger had not provided any explanation or good cause for his failure to pay, nor otherwise contacted the Sarpy County Child Support Services or the Nebraska Child Support Customer Service Call Center to provide any explanation for his failure to comply with the court's order.

We find that the State sufficiently alleged a basis for subject matter jurisdiction pursuant to § 42-358 and that the trial court had the power to enforce its previous child support order.

Accordingly, we find that the district court did not err in denying Bollinger's motion to dismiss the State's application for lack of jurisdiction.

*Sufficiency of Evidence for Contempt.*

Bollinger argues that the district court erred in finding that the State presented sufficient evidence to establish that he was in willful and contumacious contempt of a court order for failure to pay child support. Bollinger acknowledges that "there was a failure to pay the child support as ordered," but that it was not "willful and contumacious." Brief for appellant at 10. It is true that when a party to an action fails to comply with a court order made for the benefit of the opposing party, such an act is ordinarily a civil contempt, which requires willful disobedience as an essential element. *Hossaini v. Vaelizadeh*, 283 Neb. 369, 808 N.W.2d 867 (2012). "'Willful' means the violation was committed intentionally, with knowledge that the act violated the court order." *Id*. at 376, 808 N.W.2d at 873. Further, outside of statutory procedures imposing a different standard, it is the complainant's burden to prove civil contempt by clear and convincing evidence. *Id*. Notably, in the case before us, there is a statutory procedure that imposes a different standard.

Pursuant to § 42-358(3), "A rebuttable presumption of contempt shall be established if a prima facie showing is made that the court-ordered child or spousal support is delinquent." The State put into evidence a certified copy of Bollinger's child support payment history showing that as of January 11, 2013, he was in arrears in the amount of $43,892.21. Because the State made a prima facie showing that Bollinger's child support obligation was delinquent, there was a rebuttable presumption of contempt. Accordingly, we conclude that in child support enforcement actions brought pursuant to § 42-358, once a rebuttable presumption of contempt is established in accordance with the statute, the burden shifts to the delinquent party to produce evidence rebutting the statutory presumption. So we evaluate not whether the State produced sufficient evidence of willful and contumacious conduct; rather, we consider whether Bollinger produced sufficient evidence to overcome the presumption that his failure to pay the court-ordered child support was willful.

A rebuttable presumption is generally defined as a presumption that can be overturned upon the showing of sufficient proof. *Dawes v. Wittrock Sandblasting & Painting*, 266 Neb. 526, 667 N.W.2d 167 (2003), *disapproved on other grounds, Kimminau v. Uribe Refuse Serv.*, 270 Neb. 682, 707 N.W.2d 229 (2005). In most instances, a presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence. See, Neb. Evid. R. 301, Neb. Rev. Stat. § 27-301 (Reissue 2008); *Dawes, supra*. A presumption is not evidence of anything and only relates to a rule of law as to which party shall first go forward and produce evidence sustaining a matter in issue. *Bohmont v. Moore*, 138 Neb. 784, 295 N.W. 419 (1940). A presumption is not evidence of a fact, but purely a conclusion, having no probative force, and designed only to sustain the burden of proof until evidence is introduced tending to overcome it. When evidence is introduced rebutting the presumption, the presumption disappears, leaving in evidence the basic facts which are to be weighed. *Id*. We consider now whether Bollinger introduced evidence sufficient to overcome the presumption that he was in willful contempt of the child support order.

Bollinger argued at trial that his nonpayment of child support was not willful and contumacious because he had to give up work to care for Daniel. However, there was testimony from a 2004 hearing that Daniel got kicked out of daycare because Bollinger did not pay his share of the daycare costs. Subsequently, Wertman started leaving Daniel with Bollinger, who did not work during the day, because she had to work a lot of hours to support herself and her children and she received no financial help from Bollinger, except for reducing her childcare costs by having him provide childcare. Furthermore, to the extent Bollinger claims he is unable to pay, we note that Bollinger has owned his own business since 2005, but apparently that business is not profitable. As this court said in *Richardson v. Anderson*, 8 Neb. App. 923, 933, 604 N.W.2d 427, 434 (2000), "[a] parent has no right to insist upon the pursuit of fruitless dreams of success. There comes a time when a parent who is a would-be entrepreneur but is unsuccessful must simply become employed." At the time of the contempt hearing, Bollinger was 36 years old and was able to work. Bollinger did obtain a part-time job at Auto Zone in order to make his child support payments, but that was 5 months after the State filed its application and initiated the contempt proceedings.

The child support payment history received into evidence shows months and years at a time where Bollinger made no payment toward his child support obligation. As stated by the referee at the end of the contempt hearing:

> In looking at the payment history, the first income withholding, which I presume was from Auto Zone, was October 26th. Prior to that time, the last payment was a year-and-a-half previous to that, which was April of 2011, that must have been a tax intercept. Then, prior to that time, there was a payment of $42 in June of 2010. Prior to that time, the payments were in May and February of 2008. Then, prior to then, there's another payment a year earlier of $22 in March, 2007. There's a voluntary payment apparently in September of 2005 of $1300. Then it goes on and on of just total, total, total disregard of this Court's order.

There were months and years at a time when Bollinger contributed absolutely nothing toward his court-ordered child support obligation. Bollinger testified that he bought Daniel's clothes and paid for Daniel's sports activities, but he also testified that he understood that would not give him a credit on his child support obligation. In essence, he chose--knowingly and intentionally--to not pay his court-ordered child support obligation and instead chose to pay for Daniel's sports activities and other expenses. Based upon Bollinger's child support payment history showing absolutely no attempt to make any payment whatsoever for gaps as large as 1½ years at a time, along with Bollinger's own acknowledgment that he knew miscellaneous purchases would not be a credit against his child support obligation, Bollinger did not rebut the presumption of contempt, since he was unable to show that his failure to pay child support was not willful. After reviewing the record before us, we find no abuse of discretion in the district court's determination that Bollinger was in contempt for failure to pay child support.

## CONCLUSION

For the reasons stated above, we affirm the decision of the district court.

AFFIRMED.